## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| Lionel Harris, | : | |
| | : | Case No. 2:16-cv-00888 |
| Plaintiff, | : | |
| v. | : | Judge Graham |
| | : | |
| Aaron Sowers, et al., | : | Magistrate Judge Deavers |
| | : | |
| Defendants. | : | |

## OPINION & ORDER

This matter is before the Court upon cross motions for summary judgment. *See* doc. 244; doc. 245. For the following reasons, Defendants' motion is **GRANTED**.

### Background

This is a prisoner civil rights case originally filed in 2016. Plaintiff Lionel Harris ("Harris"), an inmate in the custody of Ohio Department of Rehabilitation and Correction ("ODRC"), brought this 42 U.S.C. § 1983 suit against various employees of Madison Correctional Institution ("MaCI"), alleging constitutional injuries based on their handling of his mail and his access to the courts.

In the more recent and relevant history of this case, the Court granted Defendants' motion for judgment on the pleadings, thereby dismissing several claims while leaving intact three (3) total claims against the two (2) remaining Defendants, Aaron Sowers ("Sowers") and Julia Chamberlin ("Chamberlin"). Doc. 210. Harris sought an interlocutory appeal, which the Sixth Circuit dismissed. Doc. 219; doc. 227. Thereafter, the Court granted summary judgment to the remaining Defendants on the remaining claims. Doc. 229. Harris filed another notice of appeal. Doc. 231.

[1]

On appeal, the Sixth Circuit affirmed most of the challenged portions of this Court's judgments. Doc. 236; *See Harris v. Sowers*, No. 22-4060, 2024 WL 3051285, *6 (6th Cir. Feb. 6, 2024). However, the reviewing panel reinstated Harris' retaliation claims against Defendants Michelle Lovette ("Lovette," a cashier) Cynthia Ricker ("Ricker," Lovette's supervisor), and Melanie Fultz ("Fultz," a secretary) and his access to the courts claim against Fultz. *Id.* This Court had previously dismissed these claims based on the *Leaman* doctrine, which provides that a plaintiff bringing a suit in the Ohio Court of Claims waives his right to bring the same claims in federal court. Doc. 210; *see Leaman v. Ohio Dep't of Mental Retardation & Dev. Disabilities*, 825 F.2d 946 (6th Cir. 1987). In disposing of these claims based on *Leaman*, this Court did not reach Defendants' alternative arguments for judgment in their favor. Doc. 210, # 2273. The Sixth Circuit reversed this Court as to the *Leaman*-based dismissal, citing the requirement that a *Leaman* waiver be made "knowingly, intelligently, and voluntarily," and finding that "[t]he defendants offered no convincing evidence" in support of such a finding. *Sowers*, 2024 WL 3051285 at *6. Thus, the Sixth Circuit remanded this matter to allow this Court to consider Defendants' alternative, merits-based argument for judgment. *Id.*

On remand, this Court granted leave to Defendants Lovette, Ricker, and Fultz to move for summary judgment. Doc. 242. Their motion for summary judgment has been fully briefed and is now ripe before the Court. Doc. 244. Harris, in his response opposing the Defendants' motion, has also requested summary judgment in his favor. Doc. 245.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The standard of review remains the same when reviewing cross-motions for summary judgment

[3]

versus a motion filed by only one party. *Hamilton Cnty. Educ. Ass'n v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831, 835 (6th Cir. 2016).

## DISCUSSION

Four (4) claims are at issue before the Court. Three (3) such claims allege First Amendment retaliation against each remaining Defendant, brought pursuant to 42 U.S.C. § 1983. The fourth is an access-to-courts claim brought solely against Fultz, likewise pursuant to § 1983 and the First Amendment. Specifically, Harris alleges that Ricker and Lovette, in retaliation for Harris' grievances about the cashier's office, deliberately frustrated his attempts to file legal materials. Doc. 245, # 2481. As to both the retaliation and access-to-courts claims against Fultz, Harris alleges that she confiscated or lost his § 1983 complaint in retaliation for his naming her coworkers as defendants in the complaint. *Id.* at # 2485-86.

To prevail on a First Amendment retaliation claim, Harris must show (1) he engaged in conduct which is protected under the First Amendment; (2) Defendants took an adverse action against Harris "that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) a causal connection such that "the adverse action was motivated at least in part by [Harris'] protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

## I.    Retaliation Claims as Alleged Against Ricker and Lovette

As alleged, Harris sent a "kite" (a common form of written communication available to inmates for a variety of purposes) to Defendant Ricker, the supervisor of the cashier's office, on March 6, 2015, in which he complained about the Cashier's

[4]

office "refusing" to provide a certified cashier's statement for Harris' *habeas corpus* petition. Doc. 194, # 2177. A little over a month later, on April 13, Ricker "deliberately included a deficient certified cashier's statement of [Harris'] inmate account in connection with the filing of his *habeas corpus* petition." *Id.* Due to this deficiency, Harris' family had to pay his filing fee in full. *Id.* Harris contends that this adverse action was taken with retaliatory intent. *Id.*

Relatedly, Harris alleges that Defendant Lovette also retaliated against Harris for the same protected conduct—complaining about the Cashier's office, where Lovette worked under the supervision of Ricker. *Id.* Specifically, Harris alleges that, over four (4) months after the complaining kite, in early August of 2015, Lovette "deliberately withheld [Harris'] Appeal of Right merit brief to the Supreme Court of Ohio by refusing to process the 'cash slip' necessary to pay for the mailing postage." *Id.* Though Harris claims that cash slips are required to be processed within 48 hours or less, he alleges that Lovette took seven (7) days to process his cash slip. *Id.* Because of the delay, his brief was late, and the Supreme Court of Ohio dismissed his appeal for failure to prosecute. *Id.* Due to Ricker's position as Lovette's supervisor, Harris implicates both in this act of alleged retaliation.

## A. *Protected Conduct*

Defendants argue that Harris' First Amendment retaliation claims against Ricker and Lovette fail on the first prong. Specifically, Defendants argue that, because Harris' suit at the Supreme Court of Ohio was frivolous, the suit was not protected conduct for the purposes of a First Amendment retaliation claim. Doc. 244,

[5]

# 2473 (citing *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)). This misapprehends Harris' theory.[1] Harris does not characterize his dismissed suit as the protected conduct which led Ricker and Lovette to retaliate against him. Rather, he argues that they retaliated against him due to a kite he sent complaining about their office procedures. Doc. 194, # 2177. Defendants offer no alternative argument regarding the protected-conduct prong, and they do not dispute Harris' allegation that he sent a kite with complaints about their office. Defendants do not allege that the kite was frivolous, nor do they dispute Harris' characterization, generally supported by case law, that the kite constitutes protected conduct. *See Herron v. Harrison*, 203 F.3d at 415 ("An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf."). In sum, Harris' retaliation claims against Ricker and Lovette survive summary judgment on this prong.

## B. *Adverse Action - Ricker*

Harris alleges that Ricker "deliberately included a deficient certified cashier's statement of [his] inmate account in connection with the filing of his *habeas corpus* petition thereby forcing [his] family to pay the filing fee." Doc. 194, # 2177. The Court is not persuaded that the alleged conduct is an adverse action sufficient to maintain a First Amendment retaliation claim—i.e., that which "would deter a person of ordinary firmness from continuing to engage in that conduct." *Thaddeus-X*, 175 F.3d

---

[1] Not unreasonably, on this record. *See* doc. 162, # 1912 (describing the record as complicated by "the parties' arguments assuming or referring to the right of access to the courts as the protected conduct rather than use of the grievance system as the protected conduct."). However, for his part, Harris has consistently identified the relevant protected conduct as his March 6 kite since at least October 2021. *See* doc. 194.

at 394. Harris was not ultimately prevented from filing his petition, and he did not suffer any personal financial loss by the alleged conduct. As conceded by Harris, his family paid the filing fee. He cites no support for the proposition that his family's expense constitutes an adverse action which would deter him from the protected conduct alleged—to wit, sending an informal complaint about the cashier's office.

Harris also alleges that Ricker "personally witnessed" the adverse action attributed to Lovette (*see sub.*) and, as Lovette's supervisor, "encouraged and authorized this retaliation." Doc. 194, # 2177-78. However, the law is well-settled that "§ 1983 liability will not be imposed solely upon the basis of respondeat superior." *Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004). Therefore, the Court finds that Harris cannot prevail on his retaliation claims against Ricker as a matter of law, and therefore summary judgment is warranted for Ricker on the same. Even if Harris had satisfied the second prong by alleging a sufficient adverse action, the claim would nevertheless fail on the third prong, as discussed below.

### C. *Adverse Action - Lovette*

Harris alleges that Lovette "failed to process [his] cash slip" within the time required by institutional policy, thereby delaying the transmission of his filing past the strict deadline set by the Supreme Court of Ohio. Doc. 194, # 2177. Because his brief was filed one day past the deadline, his suit was dismissed by the Supreme Court of Ohio for failure to prosecute. *Id.*

Defendants do not dispute that Harris submitted his cash slip on Wednesday, August 5, and that his brief was not sent out in the mail until Monday, August 10 (the deadline date). However, Defendants argue the intervening weekend rendered the processing time reasonable and within institutional policy, which sets a limit on holding incoming and outgoing mail for 48 hours "excluding holidays and weekends." Doc. 244, # 2476 (quoting ODRC Policy 75-MAL-01). Therefore, Harris "cannot show that actual any action taken by Defendants Ricker and Defendant Lovette acted with in ODRC procedures and did not take adverse action." *Id.* at # 2477 (sic). Defendants appear to take the position that their (arguable) compliance with institutional policy effectively rebuts Harris' assertion of adverse action. The Court is not persuaded that whether an action is adverse for the purposes of a First Amendment retaliation claim in a prison context must turn on whether the action was within institutional policy, and Defendants cite no law in support of such a proposition. Furthermore, Harris' institutional grievance was "approved" insofar as it recognized that the processing delay was in violation of institutional policy. *See* Doc. 245-1, # 2509.

Defendants do *not* argue that Harris suffered no adverse action on the theory that his dismissed suit was frivolous. *But see Lewis v. Casey*, 518 U.S. 343, 353, n.3 (1996) ("Depriving someone of a frivolous claim, on the other hand, deprives him of nothing at all."); *Maben v. Thelen*, 887 F.3d 252, 266 (6th Cir. 2018) ("[S]ome adverse actions are so *de minimis* that they do not rise to the level of a constitutionally cognizable injury."). However, the controlling law suggests that the loss of a frivolous claim (i.e., "nothing at all" (*Lewis*, 518 U.S. at 353 n.3)) is the sort of "inconsequential"

[8]

action that the Court may "weed out" as a matter of law. *Thaddeus-X*, 175 F.3d at 398.

Though not for the purpose of the adverse action prong, the Defendants *do* argue that the dismissed suit was frivolous. *See supra,* § I.A. Indeed, this Court already determined that Harris' *habeas* claims were "not meritorious." Doc. 169, # 2017. In adopting the Magistrate Judge's Report and Recommendation ("R&R") as to, *inter alia*, cross motions for summary judgment regarding the same claims considered in the instant Opinion, the Court discussed the relevant state court proceedings on Harris' *habeas corpus* claims. *Id.* at # 2016-17. After considering opinions from two separate intermediate appellate courts as well as the Supreme Court of Ohio, the Court concluded that those proceedings "firmly establish[ed] that, as a matter of Ohio law, [Harris'] *habeas* claims were not meritorious." *Id.* at # 2017. Given this conclusion, which was not disturbed on appeal, the dismissal of Harris' meritless habeas petition was "inconsequential," such that the Court can find no colorable adverse action for his retaliation claim against both Ricker and Lovette. *Thaddeus-X*, 175 F.3d at 398. Therefore, the Court concludes that Defendants are entitled to judgment as a matter of law as the same. However, even if the Court found that Harris suffered adverse action from the late mailing of his brief in August 2015, the claim would nevertheless fail, because the Court concludes that Harris cannot show that it was motivated by his March 6 kite.

D. *Causation*

Assuming, for the purposes of summary judgment, that Harris' kite in March 2015 constituted protected conduct, and that Ricker's and Lovette's dilatory operations in the cashier's office in April and August of 2015 constituted adverse actions, Harris has not alleged facts sufficient for the Court to reasonably infer a causative relationship between them.

For the causation prong, Harris bears the initial burden of establishing that his protected conduct—the March 2015 kite—was a "'substantial' or 'motivating' factor" toward the adverse action inflicted upon him. *Matulin v. Vill. of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Though the causation element usually poses a question for the jury, a court may nevertheless grant summary judgment "where it is warranted." *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996) (citing *Langford v. Lane,* 921 F.2d 677, 683-84 (6th Cir.1991)). If Harris can meet his burden, Defendants must then show that they "would have taken the same action in the absence of the protected activity." *Maben v. Thelen*, 887 F.3d 252, 267 (6th Cir. 2018).

The Supreme Court has made clear, in the employment context, that a retaliation claimant must show more than a mere possibility of causation, lest protected conduct be transformed into a preemptive shield against any adverse action. *See Doyle*, 429 U.S. at 286 ("A borderline or marginal candidate… ought not be able, by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that

[10]

record."); *see also Hartsel v. Keys*, 87 F.3d 795, 804 (6th Cir. 1996) ("[A] civil servant is not allowed to immunize herself from being fired or denied a promotion by supporting an unpopular cause or losing candidate."). The Sixth Circuit has articulated a related principle in the prison context, stating, "[an] inmate cannot immunize himself from adverse administrative action by prison officials merely by filing a grievance or a lawsuit and then claiming that everything that happens to him is retaliatory." *Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018) (quoting *Spies v. Voinovich*, 48 F. App'x 520, 525 (6th Cir. 2002). Similarly, an inmate does not create a genuine dispute of material fact as to causation by merely identifying protected conduct and adverse action in the proper sequential order.

In this case, Harris' has not met his burden. While his kite may have been protected conduct, the notion that it inspired retaliation from Ricker and/or Lovette in the manner alleged is not a reasonable inference upon these facts. As an initial matter, the kite itself—appended to Harris' responsive brief, copied in full below—is hardly a casus belli; rather than inflammatory, the kite reads as merely inquisitive:

> Cashier's Office Supervisor [i.e., Ricker],,
> I am trying to file a "Petition for Writ of Habeas Corpus" in the court of appeals. The petition requires a certified cashier's statement, (long form) I requested that a certified statement of my account be sent to my Washington (WA) unit secretary, Mrs. Eastwood so that. she could notarize it and include it in my outgoing legal mail. I've checked with my unit staff twice a week. for the past two weeks and they have informed me that they have not received anything for me from the cashier's offfice. I sent the cashier's office another kite requesting the certified statement. They returned my kite to me with a "price list" for certified statements. (see enclosed copy) My unit staff informed me that the certified account

> statements are supposed to be free? Please provide me with
> the name of the individual responsible for providing
> inmates with certified account statements.

Doc. 245-1, # 2501 [sic]. Harris cites case law for the proposition that temporal proximity between the protected conduct and the alleged adverse action may be sufficient circumstantial evidence of retaliation to survive summary judgment. Doc. 245, # 2489 (citing *Paige v. Coyner*, 614 F. 3d 273, 283 (6th Cir. 2010)). But the cases cited by Harris are distinguishable from the instant facts.

For example, in *Paige v. Coyner*, the temporal proximity of one week between the protected conduct and the adverse action was considered circumstantially probative of retaliatory intent. 614 F.3d at 281. But, in determining that the plaintiff had made a sufficient showing to stave off a motion to dismiss, the Sixth Circuit cited at least three (3) additional pieces of evidence supporting the allegation of retaliatory intent. *Id.*[2] Still, even for the lesser showing required of the nonmovant against a motion to dismiss (as compared to that required of Harris upon the motion for summary judgment presently before this Court), the appellate court described the causation element as "the closest issue in the case." *Id.*

---

[2] The plaintiff in *Paige* alleged First Amendment retaliation for her protected conduct of voicing her opinion at a public hearing. A week later, a county director who participated in the hearing contacted the plaintiff's employer and mischaracterized her comments, leading to her firing. In addition to the temporal proximity, other evidence of causation included (1) the employer's reference to the director's (false) characterization of the plaintiff's comments as reason for termination, (2) the plaintiff's five years of employment without incident, and (3) her employer's prior knowledge of her civic activities, which had never caused concerns. *Paige*, 614 F.3d at 281.

[12]

In *Maben v. Thelen*, the prisoner-plaintiff alleged that the defendant, a corrections officer, issued a misconduct citation in unlawful retaliation for the plaintiff complaining about his food portion in the cafeteria. 887 F.3d at 267-68. The court noted the "suspicious temporal proximity," pointing out that the defendant "issued the misconduct ticket *immediately* after [plaintiff] raised the issue of inadequate food portions." *Id.* at 268. But the immediate adverse reaction did not carry the day alone, as the court also referred to the plaintiff's affidavit, as well as "[t]hree separate witnesses" who corroborated the plaintiff's account. *Id.*

In the instant case, Harris can point to no evidence of causation beyond temporal proximity. His theory is that his kite sent on March 6, 2015, in which he asked for "the name of the individual responsible for providing inmates with certified account statements," (doc. 245-1, # 2501) so inflamed the ire of Ricker that, over a month later, she "deliberately included a deficient certified cashier's statement" with Harris' habeas corpus petition. Doc. 245, # 2483. Harris also believes that same kite motivated Lovette (with Ricker's approval) to retaliate against him five (5) months later. Considering the benign content of the kite, and Ricker's sworn statement that she "did not… have any reason to retaliate" against Harris (doc. 152-2, # 1681), the Court finds that Harris has failed to create a genuine dispute of material fact as to the alleged retaliatory motive.

Even if Harris had met his burden, the burden would then shift to Ricker and Lovette to show "that [they] would have taken the same action in the absence of the protected conduct." *Maben*, 887 F.3d at 267-68. Defendants offer no specific argument

[13]

on this point, though they maintain that any adverse action inflicted on Harris was inadvertent. And in that regard, an alternative explanation for the adverse action is readily available: Harris' March 6 kite, the alleged impetus for retaliatory mishandling of his mail, *complained about the mishandling of his mail*. In other words, the mishandling of the mail motivated the complaint, and now, by mere function of the passage of time, Harris contends that the complaint motivated the mishandling of the mail. This is indistinguishable from the tactic warned of by the Sixth Circuit when it held that "[an] inmate cannot immunize himself from adverse administrative action by prison officials merely by filing a grievance or a lawsuit and then claiming that everything that happens to him is retaliatory." *Maben*, 887 F.3d at 264 (quoting *Spies*, 48 F. App'x at 525). To the extent that Ricker and Lovette take the position that any adverse action was inadvertent,[3] Harris's kite supports that position by stating that he suffered similar adverse actions *before* the protected conduct.

---

[3] Harris appeared to recognize this possibility when he alleged (in a motion for partial summary judgment) that "Lovette's retaliatory actions, were deliberate or at least gross negligence." Doc. 142, # 1499 [sic]. Over the long history of this case, Harris' allegations have changed shape in numerous respects. For example, Harris previously focused on "Lovette's retaliation," and characterized Ricker's involvement as "acquiescence." *Id.* at # 1505. In the briefing currently before the Court, Harris has reconfigured his theory to cast Ricker as the primary retaliator, alleging that she "encouraged and authorized" Lovette's failure to process his cash slip, and alleging that Lovette's actions were taken while "acting as an agent of Defendant Ricker." Doc. 245, # 2484. Some shifts in theories of liability are normal, the routine byproduct of the discovery process. And Harris' current theory certainly appears more plausible upon the instant record, which makes clear that Ricker was a supervisor and Lovette only a temporary employee, and that Ricker is the only one of the two defendants who can be shown to have been personally aware of Harris' March 6 kite. But while changing theories is not necessarily problematic, and may well be normal, it does little to support the causation prong here, teetering as it is on little more than Harris' "subjective beliefs and intuition." *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996).

[14]

Similarly, Harris states in his Amended Complaint that "Prison officials [granted] Plaintiff's grievance in which he accused [Ricker and Lovette] of acting intentionally" when his filing for the Supreme Court of Ohio was delayed in August 2015. Doc. 57, # 504. But the grievance decision says nothing about Ricker and Lovette acting intentionally; to the contrary, the grievance decision appears to regard the mailing delays as a systemic issue unrelated to any animus toward Harris. It states, in pertinent part:

> Harris, this is in response to your grievance dated 10/05/2015. In your complaint you state that you were denied access to the courts due to interference with the legal mail…
>
> An investigation was completed and interviewed all pertinent individuals involved. The policy clearly states that mail shall not be held no more than 48 hours. [sic] You submitted your Legal Mail and signed Cash Slip to the Mail Room on 08/05/2015; the Cashier's Office did not process your Cash Slip until 08/07/2015. The Mail Room then did not process/stamp your Legal Mail until 08/10/2015. This exceeds the 48 hour process in processing outgoing mail. Also be advised that all postage that needs processed must be approved through the Cashier's Office to deduct from the offenders account before it can be processed and post marked.
>
> I have discussed this process with Supervisors in both areas. **This is a concern with this office and that the process needs to be changed and corrected.**
>
> Your Grievance is approved, the problem is being corrected.

Doc. 245-1, # 2509.

Harris has not made a showing sufficient to warrant presentation of this question to a jury. He experienced operational issues from the mailroom and/or

[15]

cashier's office. He sent a gently worded kite referencing these issues. Later, the institution confirmed his experience and identified the issues as a "concern." But in the meantime, Harris still experienced some of the same issues. This does not raise a reasonable inference of retaliatory motive.

E. *Conclusion as to retaliation claims against Ricker and Lovette*

Ricker and Lovette are entitled to summary judgment on Harris' claims of retaliation. As to Ricker, Harris cannot show that he suffered adverse action from her alleged mishandling of the certified cashier's statement, requiring his family to pay the full filing fee. Furthermore, Ricker cannot be held liable for Lovette's actions under a theory of respondeat superior as to this claim. As for Lovette, and as additional grounds for judgment in Ricker's favor, this Court's previous finding that Harris' underlying habeas claims were "firmly establish[ed]" as "not meritorious," forecloses a finding of adverse action based on the temporary impediments of the same. Doc. 167 at # 2017. Finally, even if Harris could establish legally cognizable adverse action attributable to Ricker and/or Lovette, his claim would still fail, as he cannot show that the adverse action was substantially motivated by his protected conduct.

## II.    Claims Against Fultz

The Court finds that Fultz is entitled to summary judgment on Harris' claims for retaliation and access-to-courts.

The factual basis is the same for both claims. Harris alleges that, on February 8, 2016, he sought to file a § 1983 suit against six (6) MaCI employees. Harris took

the complaint setting out the § 1983 suit to Fultz, the unit secretary, for notarization. After Fultz notarized the complaint—which required that she examine the document—she took possession of the complaint and placed it in a locked mailbox in the administration building, after which it "was never found, not filed and presumed destroyed." Doc. 194, # 2181. Additionally, Fultz "confiscate[d]" (doc. 245, # 2487) Harris' 6-month cashier statement, claiming that inmates were not allowed to possess the same, though the Court has since found that Harris disputed this claim by citation to institutional rules. *See* doc. 162, # 1945.

## A. *Retaliation*

As for retaliation, the parties do not dispute that Harris' § 1983 complaint was protected conduct. Additionally, the parties agree that the complaint was never filed nor even found after Fultz placed it in the administration building mailbox. But Fultz contends that "mailroom employees are the only individuals that can unlock this mailbox," which "is emptied every business day," and that after she placed the § 1983 complaint in the mailbox, she "[does] not know what happened to it." Doc. 139-9, # 1486-87. Harris does not allege that Fultz destroyed the complaint herself; rather, he alleges that (since-dismissed) Defendant Sowers destroyed the complaint, which was "enabled" by the actions of Fultz. Doc. 57, # 509. But this does not describe adverse action taken by Fultz. The undisputed facts as to Fultz's actions describe routine job functions: notarizing legal mail; placing it in an outgoing mailbox.

Harris essentially articulates three (3) points in an attempt to raise an inference of adverse action by Fultz.[4] First, Harris alleges that placing the mail in the administration building mailbox was a deviation from normal procedures, taken for the purpose of impeding or destroying Harris' lawsuit. *See* doc. 57, # 508 ("Fultz took possession of the lawsuit and thereafter was required to take it to the institution mailroom to mail to the courts – per procedure"); doc. 245, # 2486 ("Fultz took an adverse action by… taking his § 1983 complaint to the administration building instead of the mailroom); *but see* doc. 142-10, # 1586 (describing mailing procedures including daily pickup of all outgoing mail from the administration building). But Harris does not identify any factual basis for concluding that Fultz's actions deviated from normal procedure, or how her actions—placing the § 1983 complaint in the outgoing mail—were at all calculated toward the eventual destruction of his complaint. Though Harris cites to his "granted" institutional grievance regarding the loss of his § 1983 complaint, the decision approving his grievance does not describe Fultz's actions as a deviation from normal procedure (rather, the verb tense implies that her actions were consistent with normal procedure: "She claims that she only notarizes the necessary papers needed and seals the envelope and then takes it with a signed Cash Slip to the Administrative Building in the Mailroom's locked box for

---

[4] In this instance, the adverse action prong and causation prong present nearly identical questions. Though the loss of his legal materials is an adverse outcome, the inference that Fultz took deliberate actions *toward* that outcome is essentially reliant on a predicate inference that she was motivated by Harris' protected conduct to do so—i.e., the causation prong.

[18]

outgoing mail for postage") nor does it opine on the propriety of Fultz taking possession of the cashier's statement. Doc. 57-1, # 574.

Second, Harris alleges that Fultz sought to impede or destroy his lawsuit because she "recognized her long-time friends and coworkers" listed as defendants. Doc. 245, # 2492. But the Court agrees with Fultz that there is no support in the record for the conclusory statement that Fultz had any relationship with the defendants named in the § 1983 complaint. Doc. 247, # 2533-34.

Third, Harris alleges that Fultz's statement that "inmates are not allowed to possess their Six Month Cashier Statement" is contrary to institutional policy, and thus was a false pretense for her deviation from normal procedure. Doc. 139-9, # 1486. Indeed, here, Harris has identified the institutional policy provision which appears to refute Fultz's justification for taking possession of the cashier statement. *See* doc. 142-3, # 1534 (requests for six-month statements "shall be granted at no cost to the inmate, up to twice a year."). Harris has not explained how this "false pretense" enabled Fultz to take the alleged adverse actions.[5] Even if Harris is correct that the confiscation of his account statement was Fultz's reason for deviating from normal procedure, she still put the § 1983 complaint in the outgoing mail. Harris has not identified facts to raise the reasonable inference that the subsequent loss of the § 1983 complaint can be attributed to Fultz in any way.

---

[5] Fultz's affidavit suggests that the confiscation of the cashier statement was indeed a reason for her subsequent course of action: "I placed the documents in the locked mailbox in the Administration Building at [MaCI] **because** inmates are not permitted to possess their Six Month Cashier Statement." Doc. 139-9, # 1486 (emphasis supplied). But the apparent falsity of her stated reason does not lead to the reasonable inference that her *real* reason was a coordinated retaliation scheme with Defendant Sowers.

[19]

Harris relies on inferences-upon-inferences, while the undisputed facts in the record show that Fultz notarized his documents, took them, and placed them in the mail. After that, they were never accounted for. In sum, the Court finds that Fultz is entitled to summary judgment on Harris' retaliation claim as a matter of law.

## B. *Access to Courts*

Though the above reasons would also serve to dismantle Harris' access to courts claim, the Court finds that summary judgment is warranted for Fultz on this claim on independent grounds, because Harris cannot establish the necessary elements.

"Denial of access to the courts claims may be 'forward-looking' or 'backward-looking.'" *Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013). The Sixth Circuit's discussion of the two types of claims is revealing:

> In forward-looking claims, the plaintiff accuses the government of creating or maintaining some "frustrating condition," that stands between the plaintiff and "the courthouse door." […] The object of the suit is to eliminate the condition, thereby allowing the plaintiff, usually an inmate, […] to sue on some underlying legal claim[…] In backward-looking claims, such as those at issue in the instant case, the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff **is unable to ever obtain an adequate remedy on the underlying claim**.

*Id.* (citations omitted) (emphasis supplied). This taxonomy of access claims provides no recognition of claims like Harris', in which the underlying suit was (eventually) fully litigated. The *Flagg* opinion goes on to articulate the elements of a denial of access claim, further confirming that Harris' claim cannot be maintained:

[20]

> (1) a non-frivolous underlying claim, […]; (2) obstructive actions by state actors[…]; (3) "substantial[ ] prejudice" to the underlying claim that cannot be remedied by the state court,[…] and (4) a request for relief which the plaintiff **would have sought on the underlying claim and is now otherwise unattainable**.

*Id.* at 174 (emphasis supplied).

Fultz argues that Harris "cannot demonstrate he was actually impeded," and "cannot show that [he] was never able to file it." Doc. 244, # 2478. For his part, Harris retorts that "the definition of impeded does not mean ***forever*** barred." Doc. 245, # 2492. But, for the purposes of an access to courts claim in this circuit, Harris must indeed show that, due to Fultz's actions, he was "unable to ever obtain an adequate remedy on the underlying claim." *Flagg*, 715 F.3d at 173.

Harris cannot do so. As he states in his briefing, Fultz's actions "impeded [his] attempt to file this action **until he was transferred to [North Central Correctional Complex]**." Doc. 245, # 2492. In other words, Harris was able to file the § 1983 complaint at issue. The fourth element of the formulation above requires that the relief sought be "otherwise unattainable." *Id.* at 174. Plainly, a claim made "unattainable" by (ultimately unsuccessful) litigation on the merits cannot fulfill this element of a claim for *denial of access to courts*. At bottom, a fundamental element of an access to courts claim is the loss of a non-frivolous claim, and Harris has not alleged any such loss. Therefore, Fultz is entitled to summary judgment on this claim as well.

[21]

### III.    Harris' Motion for Preliminary Injunction

Following the remand of this matter from the Sixth Circuit, Harris filed a motion for preliminary injunction, seeking to enjoin "[North Central Correctional Complex] individuals from continuing to deny [him] meaningful access to this [C]ourt among others." Doc. 246, # 2523. But, as noted in the response filed on behalf of the Defendants, and as conceded by Harris, the individuals he seeks to enjoin are not parties to this case. Harris did not file a reply. The Court cannot order the relief requested, and thus his motion is denied.

### CONCLUSION

For the reasons stated above, the Court determines that Plaintiff Lionel Harris cannot prevail on his claims as a matter of law. The facts identified in the record are insufficient to support a reasonable jury's finding of retaliatory intent. Plaintiff Harris' denial of access to courts claim cannot be maintained as a matter of law, because he can identify no loss of a nonfrivolous claim. And the Court cannot enjoin the nonparties identified in Plaintiff's motion for preliminary injunction, which, in any event, is now moot. Therefore, Defendants' motion for summary judgment (doc. 244) is **GRANTED**. Plaintiff's motion for summary judgment (doc. 245) is **DENIED**. Plaintiff's motion for preliminary injunction (doc. 246) is **DENIED**.

**IT IS SO ORDERED**.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: January 12, 2026